UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

| | |
|---|---|
| JOAQUIN RAMOS,<br><br>Plaintiff,<br><br>vs.<br><br>ALEJANDRO REYES, Warden, Mike Durfee State Prison, in individual and official capacity; ELIZABETH PAUL, Medical Provider (DNP), Mike Durfee State Prison, in individual and official capacity; and DR. AARON HAYNES, Medical Director, All state facilities, in individual and official capacity,<br><br>Defendants. | 4:26-CV-04010-CCT<br><br>**OPINION AND ORDER TO DISMISS ON § 1915A SCREENING** |

Plaintiff Joaquin Ramos, an inmate at Mike Durfee State Prison, filed a pro se civil rights lawsuit. Docket 1. This Court granted Ramos's motion for leave to proceed in forma pauperis and ordered him to pay an initial partial filing fee, Docket 8, which he timely paid. But as this Court was preparing its screening order pursuant to 28 U.S.C. § 1915A, Ramos passed away.[1] Before this Court addresses Ramos's death, it screens his complaint pursuant to 28 U.S.C. § 1915A.

---

[1] Rae Yost, *DOC: 3rd inmate death in March*, *KELO* (Mar. 23, 2026, at 3:54 CDT), https://www.keloland.com/news/local-news/doc-3rd-inmate-death-in-march/.

## I. 1915A Screening

### A. Factual Background as Alleged by Ramos

Ramos's complaint[2] arises out of events occurring while he was incarcerated at Mike Durfee State Prison (MDSP). *See generally* Docket 1. On September 6, 2023, Ramos first complained to medical that he was "having problems with breathing." *Id.* at 4. After Ramos made a sick call request on September 6, 2023, he was seen by Rachel Kneifl, LPN, who placed Ramos on a list to see a provider and gave him "10 mg Loratadine[3] and 200 mg of Ibuprofen without any diagnosis whatsoever." Docket 2 ¶ 1; Docket 3 ¶ 1.[4] *See also* Docket 2-1 at 29–31. On September 8, 2023, Ramos was seen by Elizabeth Paul, DNP, and informed her that he had been experiencing shortness of

---

[2] Ramos also filed a "Motion to Substitute and Amend Pursuant to Rule § 15 & 25 of Fed R. Civ. P." Docket 9. But this motion does not appear to be aimed toward "assert[ing] matters that were overlooked or were unknown at the time" Ramos filed his original complaint, as would an amended complaint. *See generally* Docket 9; 6 *Wright & Miller's Federal Practice & Procedure* § 1473 (3d ed. 2026). Nor does the motion appear to be intended to "set[] forth transactions, occurrences, or events that have happened since the filing of the pleading to be supplemented, thereby bringing the case up to date[,]" as would a supplemental pleading. *See generally* Docket 9; 6A *Wright & Miller's Federal Practice & Procedure* § 1504 (3d ed. 2026). Therefore, this Court declines to construe this filing as either an amended or supplemental pleading, and instead liberally construes this motion, Docket 9, as a motion to add a representative, which the Court will discuss below. Additionally, Ramos also seeks to correct the spelling of Defendant Aaron Haynes's name, Docket 9 at 1, and his motion is granted to this extent.

[3] Loratadine is an antihistamine commonly known as Alavert or Claritin. *Loratadin*, *Drugs.com*, https://www.drugs.com/loratadine.html (last visited Aug. 21, 2026).

[4] Along with his complaint, Ramos filed an affidavit in support of his complaint, Docket 2, and a brief in support of his complaint, Docket 3. In considering whether Ramos has stated a claim upon which relief may be granted, the Court may look to "documents necessarily embraced by the complaint." *Zean v. Fairview Health Servs.*, 858 F.3d 520, 526 (8th Cir. 2017) (citing *Enervations. Inc. v. Minn. Min. & Mfg. Co.*, 380 F.3d 1066, 1069 (8th Cir. 2004)).

breath for at least two to three months. Docket 2 ¶ 3; Docket 3 ¶ 3. *See also* Docket 2-1 at 32–34. Ramos claims that Paul "is the 'provider' for the inmate population at MDSP and is only a 'Nurse' and not a qualified Doctor to make any diagnosis in any 'serious' medical need."[5] Docket 1 at 5. Ramos told Paul that he experienced "shortness of breath when [he] climbed stairs, walked long distances and [he] felt like [his] condition was getting worse by the day." Docket 2 ¶ 3; Docket 3 ¶ 3. "Without a diagnosis from any specialist or qualified doctor, [Ramos] was given a[n] Albuterol Inhaler, informed [he] had X-rays scheduled, and was told to come back in a month for a follow up." Docket 3 ¶ 3. Ramos claims he was told by Paul that "Asthma or COPD [chronic obstructive pulmonary disease] was suspected but instead of ordering tests and a consult from a lung specialists [sic], [he] was given treatment for an assumption." *Id.* X-rays were taken on September 13, 2023, and Ramos "received MDSP medical correspondence regarding [his] visit with the provider and the x-rays that were taken on September 13, 2025 which stated: 'Some possible Infiltrates, maybe mild pneumonia, Z pack started.'" Docket 2 ¶ 6.

On October 12, 2023, Ramos was called to medical to see Paul after he reported that his condition was getting worse and that he was not receiving adequate relief from the medication he had been provided. *Id.* ¶ 9; Docket 3

[5] Ramos provides that Paul is a "DNP[,]" Docket 1 at 2, which this Court understands to be a Doctor of Nursing Practice. According to the South Dakota Board of Nursing, Paul is licensed as a Registered Nurse and Certified Nurse Practitioner. *See Primary Source License Verification, S.D. Bd. of Nursing*, https://sdbon.boardsofnursing.org/licenselookup/Home/Report?o=afdEhYB9k4aajihcucVzCg== (last visited Aug. 25, 2026).

¶ 5. *See also* Docket 2-1 at 35–37. In the affidavit he attaches in support of his complaint, Ramos alleges that Paul diagnosed him with COPD.[6] Docket 2 ¶ 9. Paul provided Ramos with a COPD patient education packet and a Spiriva Respimat spray inhaler and scheduled Ramos for a follow up in a month without referring Ramos to a "lung specialist[.]" *Id.*; Docket 3 ¶ 5. Ramos was seen by Paul again on November 17, 2023, December 5, 2023, and January 17, 2024, where he was given inhalers, glucose tabs, and told to follow hypoglycemia protocol.[7] Docket 2 ¶¶ 10–12; Docket 2-1 at 38–43, 45–47. Ramos attaches a record from his December 5 visit noting that he "reports his symptoms vary from day to day but overall seem to be worse than 1 month ago." Docket 2-1 at 41. At his January 14 visit, however, the report notes that Ramos "states his [shortness of breath] is still slightly present with going up stairs and walking long distances, but is greatly improved since last month[,]" and the assessment states "COPD well controlled/stable[.]" *Id.* at 45, 46. The report also notes that Ramos was "educated on treatment plan and is agreeable to the plan." *Id.* at 46.

On May 29, 2024, Ramos was seen again by Paul, where he reported that he suffered from "continued shortness of breath and . . . additional triggers" which included changes in the weather, temperature, and humidity. Docket 2

---

[6] Ramos attaches records from his October 12, 2023 visit with Paul, which provide: "recommend [pulmonary function tests] to appropriately diagnose COPD; however, patient declines at this time. Will start Spiriva 2 puffs once daily. Patient educated on causes, symptoms, risks, treatments, and goals of treatment related to COPD." Docket 2-1 at 36.

[7] The "[a]ssesment" for each of these visits noted "COPD[.]" Docket 2-1 at 39, 42, 46.

¶ 14; Docket 2-1 at 48–51. Ramos was given a "normal physical exam and told [his] lungs sounded a little congested." Docket 2 ¶ 14; Docket 3 ¶ 7. Paul also referred Ramos to pulmonology and ordered labs for COPD. *Id.* On July 28, 2024, Ramos was informed that his "appointment with the specialist was delayed and rescheduled." Docket 3 ¶ 8. In September of 2024, Ramos underwent pulmonary function tests (PFTs) and had additional lab work done, but Ramos did not receive results from these tests or a diagnosis. *Id.* ¶¶ 8–10.

On November 12, 2024, Ramos was called to MDSP Medical to have his blood drawn and was informed the next day that the lab results would be reviewed at Ramos's next chronic care visit. Docket 2 ¶¶ 20, 21. On January 12, 2025, Ramos initiated a sick call request because he wanted to know the results of his PFTs, and was seen by Angela Watson, LPN. *Id.* ¶ 23. *See also* Docket 2-1 at 52–53. On January 14, 2025, Ramos was informed that his test results would be discussed at his next chronic care visit. Docket 2 ¶ 24. On February 6, 2025, Ramos submitted an Informal Resolution Request inquiring about these test results and was told that he had an upcoming chronic care visit, at which he could discuss his test results. *Id.* ¶¶ 25–26.

On March 6, 2025, Ramos "was transported to medical by an officer due to [his] progressive lung condition" and was seen by medical staff. Docket 3 ¶ 11. *See also* Docket 2-1 at 55–57. At this point, Ramos had a temperature of 102 degrees Fahrenheit and was given acetaminophen and ibuprofen. Docket 3 ¶ 11. Ramos was "told [he] had to walk a few blocks to the med line each morning for three days for muesinex [sic]" which he found to be "cruel and

unusual as not only did [he] have a fever but [he] was still having trouble with shortness of breath." Docket 2 ¶ 28.

Ramos was transported to medical again on March 11, 2025, due to "breathing complications." Docket 3 ¶ 12. He was seen by Dayna Klawitter, RN, and Paul, who sent Ramos to the emergency room in Tyndall, South Dakota, after assessing his condition. *Id. See also* Docket 2-1 at 58–60. At the hospital, Ramos was given prednisone and antibiotics. Docket 3 ¶ 12. Ramos was seen by Paul on March 13, 2025, for a Nursing Infirmary Assessment following his visit to the emergency room. *Id.* ¶ 13. *See also* Docket 2-1 at 69–73. Ramos spent the night in the MDSP medical clinic for a "diagnosis of COPD exacerbation" and was given albuterol and placed on oxygen. Docket 2 ¶ 31; Docket 3 ¶ 13.

On March 14, 2025, Ramos was having x-rays completed at MDSP when Paul sent Ramos to the emergency room in Tyndall for a second time. Docket 3 ¶ 14. *See also* Docket 2-1 at 74. At the emergency room, x-rays and blood draws were conducted, and Ramos was placed on oxygen and IVs and given prednisone, steroids, and antibiotics. Docket 3 ¶ 14. Ramos alleges that this was "the first time [he] was given some kind of real diagnosis in which they believed [he] had Fibrosis by an actual doctor." *Id.*

After Ramos spent two days in the hospital, he returned to MDSP on March 16, 2025. *Id.* ¶ 15. On March 17, 2025, Paul completed a follow up examination and provided Ramos with doxycycline and a nebulizer. *Id. See also* Docket 2-1 at 82–84. Ramos also submitted two grievances on March 17, "[o]ne

for making [him] suffer over night with severe breathing issues on the night of March 6th, 2025," and the other requesting his medical records. Docket 3 ¶ 16.

On March 24, 2025, Ramos made a sick call request because he was experiencing "serious issues" with his breathing. *Id.* ¶ 18. He was seen by Paul, who informed him that he was scheduled to see a pulmonologist and that his prescription for fluticasone propionate[8] had been increased. *Id.*; Docket 2 ¶ 37. Ramos made a sick call request again on April 7, 2025, for "severe breathing problems." Docket 3 ¶ 19. After he was "looked over by medical staff[,]" Paul sent Ramos to the emergency room, where it was determined that he had influenza. *Id. See also* Docket 2-1 at 89. Ramos received medication to treat the influenza. Docket 3 ¶ 19. When he returned to MDSP, Paul provided Ramos with oseltamivir[9] for five days and acetaminophen and ibuprofen for two weeks, and Ramos was "put on lay in trays for one week." Docket 2 ¶ 38.

Ramos was called to medical for a follow up visit on April 14, 2025, and Paul decided to send Ramos to the emergency room in Tyndall again, where he was seen by a doctor and given prednisone and doxycycline. *Id.* ¶ 40; Docket 3 ¶ 20. *See also* Docket 2-1 at 95. The doctor Ramos saw at the emergency room also "extended lay-in trays for additional week[,]" and informed Ramos that "he would be recommending that [Ramos] be completely taken off the Fluticasone

---

[8] Fluticasone propionate, also known as Flovent, "is a steroid used to prevent asthma attacks." *Flovent*, *RxList*, https://www.rxlist.com/flovent-drug.htm (last visited Aug. 21, 2026).

[9] Oseltamivir is also known as Tamiflu and is used to treat influenza. *Oseltamivir*, *Drugs.com*, https://www.drugs.com/oseltamivir.html (last visited Aug. 21, 2026).

Propionate that the MDSP medical team had just increased to 500mg on March 24, 2025." Docket 2 ¶ 40.

During an April 17, 2025 visit with Paul, Ramos "was given a completely new treatment plan with all new medication[,]" and "[a]ll the old medication" was discontinued. Docket 3 ¶ 21. Ramos was also informed during this visit that his new treatment plan included taking ipratropium bromide[10] and albuterol sulfate[11] four times a day for seven days, and that his fluticasone propionate would be discontinued. Docket 2 ¶ 41.

On April 23, 2025, Ramos filed an Administrative Remedy claiming that he had been "misdiagnosed with COPD by the MDSP medical staff and therefore improperly treated for that[, w]hen in fact [he] had Fibrosis" that he should have been "treated properly for." Docket 3 ¶ 22. Ramos alleges that "[t]he delay in proper medical treatment of a severe medical issue is the reason for [his] severe continuation of deterioration of [his] health and lung capacity[,]" and that he has "been suffering in extreme pain and no sleep while not being able to breath." *Id.*

---

[10] "Ipratropium is used to help control the symptoms of lung diseases, such as asthma, chronic bronchitis, and emphysema. It is also used to treat air flow blockage and prevent the worsening of chronic obstructive pulmonary disease (COPD)." *Ipratropium (inhalation route)*, *Mayo Clinic*, https://www.mayoclinic.org/drugs-supplements/ipratropium-inhalation-route/description/drg-20067557 (last visited Aug. 21, 2026).

[11] "Albuterol sulfate (albuterol sulfate inhalation solution) is a bronchodilator used to treat or prevent bronchospasm in people with reversible obstructive airway disease." *Albuterol Sulfate*, *RxList*, https://www.rxlist.com/albuterol-sulfate-drug.htm (last visited Aug. 21, 2026).

On May 2, 2025, Ramos was sent to Yankton Medical Center to see a pulmonologist. *Id.* ¶ 23. The pulmonologist "reported that [Ramos's] lungs [had] become significantly worse in the last year" and that he "wanted to run several more tests . . . including a biopsy." *Id.* The pulmonologist informed Ramos that "it would ultimately be up to the staff . . . at MDSP to determine if and when these tests would be approved." *Id.* The pulmonologist informed Ramos that "he was going to inquire about a lung transplant." *Id.* The pulmonologist also told Ramos that "he wanted [Ramos] to be as active as [he] could to include walking." Docket 2 ¶ 44.

On May 15, 2025, Ramos was transported to medical because he "was having [a] severe episode of not being able to breath [sic]." Docket 3 ¶ 24; *see also* Docket 2-1 at 101. Ramos was given oxygen and nebulizer treatment. Docket 3 ¶ 23. On May 23, 2025, Ramos was taken to the Tyndall Avera Medical Center to have a CT scan of his chest taken. Docket 2 ¶ 48.

On June 4, 2025, Ramos was called to the medical department at MDSP for lab draws and was seen by a nurse. *Id.* ¶ 50. *See also* Docket 2-1 at 103–05. He gave this nurse a kite to give to the provider regarding his "increased difficulty breathing over the simplest of tasks." Docket 2 ¶ 50. On June 5, 2025, when Ramos again had difficulty breathing, he was given more oxygen tanks and informed that his appointment with the pulmonologist would be "fast track[ed.]" Docket 3 ¶ 25. *See also* Docket 2-1 at 106–08.

On June 12, 2025, Ramos saw the pulmonologist at Yankton Medical Center. Docket 3 ¶ 26. Ramos was given "breathing tests" and was informed that "he was only using 45% of his lungs." *Id.* Ramos was scheduled to see a rheumatologist and receive a CT scan in November. *Id.* Ramos wrote to the Secretary of Corrections about his "condition and declining health[]" on June 22, 2025. *Id.* ¶ 27.

On July 1, 2025, Ramos was called to medical at MDSP and was given a copy of the medical records he had requested on March 17, 2025. Docket 2 ¶ 58.

On July 15, 2025, Ramos visited a rheumatologist at Yankton Medical Center, where he was "given numerous tests from blood tests to urine samples." Docket 3 ¶ 29. The rheumatologist told Ramos "that the hope was that she and the Pulmonologist would be able to determine an effective treatment plan." Docket 2 ¶ 63 (emphasis in original omitted). Also on July 15, Ramos received correspondence from MDSP informing him that the "medical transplant program was rejected at this time as Pulmonology does not seem to be recommending lung transplant evaluation at the June visit[,]" and that Paul was "awaiting Rheumatology Recommendations for next step." Docket 3 ¶ 30.

Ramos made a sick call request on August 5, 2025, because his "breathing problems had become worse" and because he was "losing [his] breath over the simplest of tasks like showering." *Id.* ¶ 31. He was also "having more episodes where [he was] experiencing tingling in [his] feet, sensitivity in [his] chest, coughing fits, the urge to urinate and actually vomiting." *Id.* Ramos

was told that he was scheduled to see a provider, and on August 7, 2025, he was called to MDSP Medical for another provider visit. Docket 2 ¶¶ 65, 67. The provider informed Ramos that "there was nothing she could do since the Pulmonologist and Rheumatologist had not reported any findings as to why this was happening to [Ramos] or how to treat it." Docket 3 ¶ 33. Ramos believed this statement to be "at odds" with what the rheumatologist had told him on his July 15, 2025 visit. *Id.* Ramos states that "[a]ll that [he] found out in his August 7 visit was that the specialist ordered a biopsy[,]" and contends that the provider did not take any vitals measurements, such as checking his blood pressure, temperature, or listening to his lungs. *Id.*

On August 8, 2025, rheumatology informed the MDSP medical department that all of Ramos's labs were negative. *Id.* ¶ 34. Ramos was told that his condition "was being discussed with Doctor Haynes and it was agreed to have [Ramos] see a second Pulmonologist for further assessment and recommendations." *Id.* Ramos "was told to continue to use oxygen, wheelchair, and current medications until pulmonology follow up." *Id.* At this point, Ramos "had made multiple grievances for the delay of treatment and the failure to treat his symptoms allowing him to suffer and progressively get worse as time went on[.]" *Id.* ¶ 35.

As injuries, Ramos states that the delay in his treatment caused "further deterioration of the lungs . . . which will result in a lung transplant. This has caused further pain and suffering which causes very little sleep and a lot of extreme discomfort." Docket 1 at 4. Ramos states that he has suffered for two

years in "extreme pain throughout [his] body but centralized in [his] lungs[,]" and that he "suffer[s] from lack and very labored breathing, no strength whatsoever, fainting spells etc." *Id.* at 5. Ramos sues Alejandro Reyes, Warden at MDSP; Elizabeth Paul, the medical provider (DNP) at MDSP; and Aaron Haynes, the Medical Director at all state facilities, in both their individual and official capacities. *Id.* at 2.

In his request for relief, Ramos requests $3.5 million in compensatory damages, $5 million in punitive damages, and "[a]ttorney fees to be determined by the court or $1 million dollars all filing fees to be compensated." *Id.* at 7. As injunctive relief, Ramos requests "specialized medical treatment for his lungs," that he be placed on the lung transplant list, that he receive continued medical treatment "for all medical issues[,]" and that the Court order "that no form of retaliation may occur for the filing of this complaint." *Id.* (capitalization in original omitted).

**B. Legal Standard**

A court must assume as true all facts well pleaded in the complaint when screening under 28 U.S.C. § 1915A. *Est. of Rosenberg v. Crandell*, 56 F.3d 35, 36 (8th Cir. 1995). Civil rights and pro se complaints must be liberally construed. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004). Even with this construction, "a *pro se* complaint must contain specific facts supporting its conclusions." *Martin v. Sargent*, 780 F.2d 1334, 1337 (8th Cir. 1985) (citation omitted); *see also Ellis v. City of Minneapolis*, 518 F. App'x 502, 504 (8th Cir. 2013) (per curiam). Civil

rights complaints cannot be merely conclusory. *Davis v. Hall*, 992 F.2d 151, 152 (8th Cir. 1993) (per curiam) (citation omitted); *Parker v. Porter*, 221 F. App'x 481, 482 (8th Cir. 2007) (per curiam).

A complaint "does not need detailed factual allegations . . . [but] requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). If it does not contain these bare essentials, dismissal is appropriate. *Beavers v. Lockhart*, 755 F.2d 657, 663 (8th Cir. 1985). *Twombly* requires that a complaint's factual allegations must be "enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true[.]" *Twombly*, 550 U.S. at 555 (citations omitted); *see also Abdullah v. Minnesota*, 261 F. App'x 926, 927 (8th Cir. 2008) (per curiam) (noting complaint must contain either direct or inferential allegations regarding all material elements necessary to sustain recovery under some viable legal theory (citation omitted)). Under 28 U.S.C. § 1915A, the Court must screen prisoner complaints and dismiss them if they "(1) [are] frivolous, malicious, or fail[] to state a claim upon which relief may be granted; or (2) seek[] monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b). This Court will now assess Ramos's claims under 28 U.S.C. § 1915A.

### C. Legal Analysis

#### 1. Official Capacity Claims for Monetary Relief

Ramos sues all defendants in their official capacities and seeks monetary relief. Docket 1 at 2, 7. As employees of the South Dakota Department of Corrections (DOC), all defendants (Reyes, Paul, and Haynes) are employees of the State of South Dakota. *Id.* at 2. "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Thus, Ramos's official capacity claims against the defendants are construed as claims against the State of South Dakota. *Id.* While "[§] 1983 provides a federal forum to remedy many deprivations of civil liberties, . . . it does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Id.* at 66.

The Eleventh Amendment generally acts as a bar to suits against a state for money damages unless the state has waived its sovereign immunity. *Id.* The State of South Dakota has not waived its sovereign immunity. Further, Ramos seeks punitive damages against all defendants. Docket 1 at 7. "Punitive damages are not available against government officials sued in an official capacity[.]" *S.A.A. v. Geisler*, 127 F.4th 1133, 1140 (8th Cir. 2025) (en banc). Thus, Ramos's claims against Reyes, Paul, and Haynes in their official capacities for money damages are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(b)(iii) and 1915A(b)(2).

### 2. Individual and Official Capacity Claims for Injunctive Relief

Ramos seeks injunctive relief from defendants in their individual and official capacities. Docket 1 at 2, 7. As an initial matter, Ramos may not seek injunctive relief against defendants in their individual capacities. "Section 1983 plaintiffs may sue individual-capacity defendants only for money damages and official-capacity defendants only for injunctive relief." *Brown v. Montoya*, 662 F.3d 1152, 1161 n.5 (10th Cir. 2011); *see also Cmty. Mental Health Servs. v. Mental Health & Recovery Bd.*, 150 F. App'x 389, 401 (6th Cir. 2005) ("Just as a plaintiff cannot sue a defendant in his official capacity for money damages, a plaintiff should not be able to sue a defendant in his individual capacity for an injunction in situations in which the injunction relates only to the official's job, *i.e.*, his official capacity.").

Further, Ramos's requests for injunctive relief must be dismissed as moot. Ramos's requests relate to the medical care he was receiving, as well as a request that he not be retaliated against for filing this complaint. Docket 1 at 7. In light of Ramos's passing, these requests for injunctive relief are now moot. *See Mo. Pro. & Advocacy Servs., Inc. v. Carnahan*, 499 F.3d 803, 811 (8th Cir. 2007) ("In general, a pending claim for injunctive relief becomes moot when the challenged conduct ceases and there is no reasonable expectation that the wrong will be repeated." (internal quotation omitted)); *Martin*, 780 F.2d at 1337 (recognizing that a "a prisoner's claim for injunctive relief to improve prison conditions is moot if he or she is no longer subject to those conditions.").

Therefore, Ramos's requests for injunctive relief against Reyes, Paul, and Haynes, in their individual and official capacities, are dismissed as moot.

**3. Individual Capacity Claims for Monetary Relief**

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009).

> Thus, each Government official . . . is only liable for his or her own misconduct. As we have held, a supervising officer can be liable for an inferior officer's constitutional violation only if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.

*Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citation modified). Ramos's individual capacity claims must allege that each individual defendant either directly participated in the unconstitutional conduct or caused the conduct to occur through a failure to train or supervise the offending actor. *See id.*

Ramos alleges an Eighth Amendment[12] deliberate indifference claim against Reyes, Paul and Haynes. Docket 1 at 4–6. "[D]eliberate indifference to

---

[12] Ramos also states that his Eighth Amendment rights were violated "by way of the 14th Amendment as to Cruel and Unusual Punishment for Medical Negligence and Malpractice resulting in severe medical issues and severe pain and suffering." Docket 1 at 5. The Fourteenth Amendment, rather than the Eighth Amendment, is applied to pretrial detainees' claims of deliberate indifference. *See Hartsfield v. Colburn*, 371 F.3d 454, 457 (8th Cir. 2004) (collecting cases). But Ramos makes no allegations that he was a pretrial detainee at the time the events giving rise to his complaint occurred. *See generally* Docket 1. Even if Ramos were a pretrial detainee at the time of these events, the same standard would apply – the Eighth Circuit "appl[ies] the deliberate-indifference standard that governs claims brought by convicted inmates under the Eighth Amendment[]" to pretrial detainees' claims arising under the Fourteenth Amendment. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014). Further, Ramos identifies no conduct distinct from the alleged denial of constitutionally adequate medical care. *See generally* Docket 1. Because the Eighth Amendment

serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . . proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104–05 (footnotes omitted). "This conclusion does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Id.* at 105. "[A] prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* at 106. Allegations of negligence will not suffice, nor will mere disagreement with treatment decisions. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (citing *Est. of Rosenberg*, 56 F.3d at 37).

The deliberate indifference standard includes both an objective and subjective component. *Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997) (citing *Coleman v. Rahija*, 114 F.3d 778, 784 (8th Cir. 1997)). The plaintiff "must demonstrate (1) that [he] suffered objectively serious medical

---

provides the explicit constitutional source of protection against deliberate indifference to a convicted prisoner's serious medical needs, Ramos may not pursue the same allegations as a separate due process claim. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that where a particular constitutional amendment provides an explicit source of protection against the challenged government conduct, that amendment—not the more generalized notion of substantive due process—governs the claim). To the extent that Ramos intended to assert a Fourteenth Amendment claim, this claim is dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

needs and (2) that the prison officials actually knew of but deliberately disregarded those needs." *Id.* (citing *Coleman*, 114 F.3d at 784). "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Coleman*, 114 F.3d at 784 (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)). To be liable for deliberately disregarding medical needs, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Beginning with the first prong, Ramos alleges that he was in "extreme pain[,]" that his breathing was "labored so bad that he would feel faint at times[,]" and that "[a]ll defendants named herein knew that a serious medical need was very apparent to all staff as anyone could see he was suffering from something that could not have been handled in prison[.]" Docket 1 at 4, 6. For purposes of screening, this Court assumes that Ramos suffered from a serious medical need, and the Court will now evaluate whether Ramos has plausibly established the second prong for each defendant.

**a. Eighth Amendment Claim Against Paul**

Ramos alleges that Paul demonstrated deliberate indifference because she "misdiagnosed" Ramos, Docket 1 at 4, "schedule[d] unnecessary treatments and tests in an effort to delay [Ramos's] treatment causing him to get significantly worse as time would go by[,]" Docket 3 ¶ 38, and because she did not provide him with his requested treatments, Docket 1 at 6. Ramos also

alleges that because of “this negligence and malpractice [he has] been suffering for the past two years in extreme pain[.]” Docket 1 at 5.

Beginning with Ramos’s claims of negligence and malpractice, the Eighth Circuit has made clear that “[d]eliberate indifference is akin to criminal recklessness,” and “[n]egligent misdiagnosis does not create a cognizable claim under § 1983.” *Cannon v. Dehner*, 112 F.4th 580, 587 (8th Cir. 2024) (quoting *McRaven v. Sanders*, 577 F.3d 974, 982 (8th Cir. 2009)) (last alteration in original). Similarly, “[m]edical malpractice alone . . . is not actionable under the Eighth Amendment[,]” and in order to state a claim for deliberate indifference, “the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation.” *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 499 (8th Cir. 2008) (quotation omitted). Here, Ramos’s own allegations describe Paul as negligent and as having negligently diagnosed him, *see* Docket 1 at 5, 6; Docket 3 ¶¶ 39, 41, and he provides no facts suggesting that Paul’s conduct constituted “more than negligence, more even than gross negligence[.]” *Popoalii*, 512 F.3d at 499; *see generally* Dockets 1, 2, 3.

Considering Ramos’s allegations that Paul misdiagnosed him, a plaintiff’s “disagreement with their diagnosis, or lack thereof, does not establish a deliberate indifference claim.” *De Rossitte v. Correct Care Sols.*, LLC, 22 F.4th 796, 803 (8th Cir. 2022). Here, Ramos provides no facts that would suggest that Paul’s misdiagnosis rose to the level of criminal recklessness. *See generally* Dockets 1, 2, 3. *See also McRaven*, 577 F.3d at 982 (stating that

"[n]egligent misdiagnosis does not create a cognizable claim under § 1983."); *Christianson v. McLean Cnty.*, 176 F.4th 1076, 1085 (8th Cir. 2026) (recognizing that "a misdiagnosis does not rise to the level of deliberate indifference." (quoting *Allard v. Baldwin*, 779 F.3d 768, 772 (8th Cir. 2015)).

Additionally, Ramos broadly alleges that Paul made improper treatment decisions. *See, e.g.*, Docket 1 at 4–6. "Grossly incompetent or inadequate care can constitute deliberate indifference but the care provided must be so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Dulany*, 132 F.3d at 1242 (quotation omitted). Here, Ramos does not provide facts that suggest Paul acted in a manner that was grossly incompetent or inadequate, or that her treatment of Ramos constituted intentional maltreatment. *See generally* Dockets 1, 2, 3. On the contrary, Ramos's submissions along with his complaint demonstrate that he was seen by Paul on multiple occasions, provided treatment, and referred to specialists. *See generally* Docket 2-1; *see also* Dockets 2, 3.

Although Ramos disagrees with the treatment he received and alleges that he should have been referred to a specialist sooner, *see* Docket 1 at 4–6, a medical professional does not demonstrate deliberate indifference by failing to follow a prisoner's "more aggressive treatment demands[.]" *Cannon*, 112 F.4th at 589. "[I]nmates have no constitutional right to receive a particular or requested course of treatment, and [prison medical professionals and nurses] remain free to exercise [their] independent medical judgment." *Id.* at 587, 589 (citation omitted). *See also Schaub v. VonWald*, 638 F.3d 905, 915 (8th Cir.

2011) (providing that "[d]eliberate indifference must be measured by the official's knowledge at the time in question, not by 'hindsight's perfect vision.'" (citation omitted)).

Here, Ramos does not provide facts that, "[b]ased on the information available to [Paul] at the time," her treatment of Ramos was "so inadequate as to amount to intentional maltreatment." *Cannon*, 112 F.4th at 589; *see also Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1118–19 (8th Cir. 2007) (recognizing that disagreement with a course of treatment does not constitute deliberate indifference (citation omitted)); *Phillips v. Jasper Cnty. Jail*, 437 F.3d 791, 795 (8th Cir. 2006) (holding that mere disagreement with a treatment decision is not enough to state a cognizable deliberate indifference claim); *Dulany*, 132 F.3d at 1240 ("[A]n inmate is not entitled to any particular course of treatment."). Therefore, Ramos's deliberate indifference claim against Paul in her individual capacity for money damages is dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

**b. Eighth Amendment Claim Against Haynes**

Ramos alleges an Eighth Amendment deliberate indifference claim against Dr. Haynes based on Haynes's role as the Director of Medical Services. Docket 1 at 5. Ramos's deliberate indifference claim against Haynes appears to be based on both Haynes's direct involvement in Ramos's care and Haynes's role as a supervisor.

Beginning with Ramos's claim that Haynes was involved in his treatment, Ramos alleges that his condition was "discussed with Doctor Haynes and it was agreed to have [Ramos] see a second Pulmonologist for further assessment and recommendations." Docket 3 ¶ 34. Ramos also alleges that "Haynes has final say and approval for all requests that come from outside specialists beyond the prison[,]" and that Haynes "played a huge role in the denial of suggested specific treatment that came from the outside specialist." *Id.* ¶¶ 46, 47. To the extent that Ramos is alleging that Haynes was directly involved in overseeing his treatment, Ramos's claim fails because he alleges no more than disagreement with treatment decisions. *See, e.g.*, *id.* ¶ 46 (alleging that Haynes did not accept Ramos's requests for "specific course of treatments, tests, and even the possibility of a lung transplant"). As discussed above, "inmates have no constitutional right to receive a particular or requested course of treatment, and [prison medical professionals] remain free to exercise their independent medical judgment." *Cannon*, 112 F.4th at 587 (citation omitted). And, as with Ramos's claims against Paul, Ramos provides no facts suggesting that Haynes acted in a manner that was grossly incompetent or inadequate, or that his treatment of Ramos constituted intentional maltreatment. *See generally* Dockets 1, 2, 3.

Ramos also appears to allege a claim against Haynes based on a failure to train or supervise. *See* Docket 1 at 2 (stating that Haynes is "the Supervising authority for all the medical teams."). "To impose supervisory liability, other misconduct [by the medical defendants] must be very similar to the conduct

giving rise to liability." *Saylor v. Nebraska*, 812 F.3d 637, 645 (8th Cir. 2016) (alteration in original) (quotation omitted). "[T]o be liable under § 1983 the medical defendants had to personally violate [plaintiff's] rights or be responsible for a systematic condition that violates the Constitution." *Id.* (citation omitted). But here again, Ramos's deliberate indifference claims revolve around his disagreement with treatment decisions and his allegations of negligence and misdiagnosis, none of which state a cognizable deliberate indifference claim under the Eighth Amendment.

This Court also understands Ramos to be alleging a claim against Haynes in his supervisory capacity based on the policies he created and implemented in his role as Director of Medical Services. *See* Docket 1 at 5. "Even if a supervisor is not involved in day-to-day operations, his personal involvement may be found if he is involved in 'creating, applying, or interpreting a policy' that gives rise to unconstitutional conditions." *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014) (quoting *Bonner v. Outlaw*, 552 F.3d 673, 679 (8th Cir. 2009)).

Ramos alleges that Haynes, in his role as "'Director of all Medical' for the Department of Corrections in the State of South Dakota[,] . . . is the one who stipulates, creates, and approves all policies and procedures that are requested." Docket 3 ¶ 46. *See also* Docket 1 at 5 (alleging that "Haynes is the one who makes policies for all facilit[ies] and is the main reason Mike Durfee State Prison does not have a Doctor in the facility to make all the proper medical diagnosis and evaluations so that the plaintiff could have been treated

properly[.]"). Liberally construing his complaint, Ramos is alleging that Haynes created and implemented a policy where he approves certain procedures, as well as a policy making Paul the only medical provider at MDSP, and that these policies have created unconstitutional conditions. But Ramos's claims regarding these policies all relate to his disagreement with his medical treatment.

Beginning with his claim regarding the policy of only having one medical provider, Ramos alleges that the policy resulted in unconstitutional conditions because Paul was unqualified to provide medical treatment. *See* Docket 1 at 4–6. Ramos's belief that Paul was unqualified, however, stems from his disagreement with her treatment decisions and because she initially misdiagnosed him with COPD. *See id.* at 4. But, as discussed above, mere negligence, disagreement with treatment decisions, and misdiagnoses do not rise to the level of constitutionally inadequate medical care. *See supra* at 18–21.

Ramos's claim that Haynes's policy of accepting or rejecting certain procedures created unconstitutional conditions similarly fails to state a cognizable claim. "Prisoners do not have a constitutional right to any particular type of treatment[, and p]rison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment." *Long v. Nix*, 86 F.3d 761, 765 (8th Cir. 1996) (citations omitted). Ramos provides no facts that Haynes, by exercising his professional medical judgment in accepting or rejecting

procedures, provided grossly incompetent or inadequate care. *See generally* Docket 1; *see also Dulany*, 132 F.3d at 1242. Thus, Ramos's Eighth Amendment deliberate indifference claim against Haynes in his individual capacity for money damages is dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

#### c. Eighth Amendment Claim Against Reyes

Ramos alleges that "Warden Reyes was deliberately Indifferent to [his] Serious Medical needs by refusing to address the issue when it was brought to his attention pursuant to verbal and grievances filed on the issues." Docket 1 at 2. To state a claim against a supervisor, a plaintiff "must allege and show that the supervisor personally participated in or had direct responsibility for the alleged violations or that the supervisor actually knew of, and was deliberately indifferent to or tacitly authorized, the unconstitutional acts." *Saylor*, 812 F.3d at 644 (citation modified).[13] When a supervisor does not have "'a reason to believe (or actual knowledge) that prison doctors or their assistants [were] mistreating (or not treating) [the plaintiff],' they cannot be held liable for cruel and unusual punishment in violation of the Eighth Amendment." *Id.* (first alteration in original) (quoting *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008)).

---

[13] Unlike with Haynes, Ramos does not allege that Reyes was involved in the creation or implementation of a policy that led to the deprivation of his constitutional rights. *See generally* Docket 1.

Here again, Ramos's claim against Reyes relates to Ramos's disagreement with treatment decisions. Ramos claims that "[a]ll defendants . . . knew that a serious medical need was very apparent" and that '[t]he lack of treatments, diagnosis, and just being treated bad by Medical staff was grievanced" but that he was still "treated badly by staff and ignored[.]" Docket 1 at 6. But the records Ramos submits show that prison medical staff were taking steps to meet his medical needs and that Ramos did receive treatment – albeit not the treatment Ramos believed he should be receiving. *See generally* Dockets 2, 2-1, 3. Ramos does not provide facts showing that Reyes "knew of, participated in, or implicitly authorized, the mistreatment or nontreatment of [Ramos], such as is necessary to maintain a claim of deliberate indifference under the Eighth Amendment." *See Saylor*, 812 F.3d at 644 n.5.

Further, Ramos also does not allege that, as the Warden of MDSP, Ramos was involved in making treatment decisions. *See generally* Docket 1. "[P]rison officials who lack[] medical expertise, and who [were] not involved in treatment decisions made by medical staff, 'cannot be liable for the medical staff's diagnostic decisions.'" *Manning v. United States*, No. 2:20-CV-00168-LPR-JTR, 2021 WL 11549344, at *3 (E.D. Ark. Mar. 29, 2021) (quoting *Keeper v. King*, 130 F.3d 1309, 1314 (8th Cir. 1997)); *see also Camberos*, 73 F.3d at 176 (providing that "a general responsibility for supervising the operations of a prison is insufficient to establish the personal involvement required to support liability. Moreover, because [the treatment director and Warden] lacked medical expertise, they cannot be liable for the medical staff's diagnostic decision not to

refer [plaintiff] to a doctor[.]”). Therefore, Ramos’s Eighth Amendment deliberate indifference claim against Reyes in his individual capacity for monetary damages is dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

#### 4. State-Law Claims

Liberally construing his complaint, Ramos alleges state-law claims for medical negligence and medical malpractice. Docket 1 at 5. Before the Court considers whether Ramos has alleged viable state-law claims, the Court must consider whether it has subject-matter jurisdiction over his state-law claims. *See Sanders v. Clemco Indus.*, 823 F.2d 214, 216 (8th Cir. 1987) (stating that district courts should “be attentive to a satisfaction of jurisdictional requirements in all cases.” (citation omitted)); *see also* Fed. R. Civ. P. 12(h)(3) (“If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.”).

A federal court has jurisdiction over two main kinds of cases: “diversity cases—suits between citizens of different States as to any matter valued at more than $75,000. *See* 28 U.S.C. § 1332(a). And they have power to decide federal-question cases—suits ‘arising under’ federal law. § 1331.” *Badgerow v. Walters*, 596 U.S. 1, 8 (2022). Here, Ramos has failed to establish that subject-matter jurisdiction exists over his state-law claims. First, there is no federal cause of action for medical malpractice or medical negligence. *See Davis v. Ennen Eye Ctr.*, No. 2:24-CV-02067-SOH-MEF, 2024 WL 4143335, at *4 (W.D. Ark. Aug. 8, 2024), *report and recommendation adopted by* 2024 WL 4142751

(W.D. Ark. Sep. 10, 2024); *Smith v. Kendricks*, No. 5:23-CV-05220-TLB-CDC, 2024 WL 1403102, at *2 (W.D. Ark. Mar. 12, 2024). Second, because Ramos has alleged no facts that Reyes, Paul, or Haynes are citizens of a different state, *see* Docket 1, he has failed to meet his burden of establishing diversity jurisdiction. *See Hertz Corp. v. Friend*, 559 U.S. 77, 96 (2010) ("The burden of persuasion for establishing diversity jurisdiction, of course, remains on the party asserting it." (citation omitted)). Therefore, the Court would have to exercise supplemental jurisdiction to hear Ramos's state-law claims.

Under 28 U.S.C. § 1367(a), this Court "shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy[.]" 28 U.S.C. § 1367(a). Nonetheless, the Court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). Because this Court has dismissed Ramos's § 1983 claims, the only claims within this Court's original jurisdiction, the Court declines to exercise supplemental jurisdiction over Ramos's state-law claims.

## II. Remaining Motions

Ramos also filed a motion to appoint counsel. Docket 6. Because all of Ramos's claims have been dismissed, his motion to appoint counsel, Docket 6, is denied as moot.

Additionally, Ramos filed a "Motion to Substitute and Amend Pursuant to Rule § 15 & 25 of Fed R. Civ. P." Docket 9.[14] Federal Rule of Civil Procedure 25(a) provides that

> If a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

Fed. R. Civ. P. 25(a)(1). But Ramos himself filed this motion while he was still alive. *See* Docket 9. Therefore, to the extent that Ramos intended to file a motion under Rule 25(a) to add his representative as a plaintiff, this motion, Docket 9, is denied. *See Christians v. Christensen*, No. 4:22-CV-04072-LLP, 2025 WL 934617, at *13 (D.S.D. Mar. 27, 2025) (denying a motion to add next of kin as a plaintiff under Rule 25(a) because the party making the motion was alive and actively prosecuting the case at the time he made the motion).

Here, the docket does not reflect that a motion for substitution has been made, or that a statement noting Ramos's death has been filed and served. Because defendants have not been served, they would not be parties to this case capable of making a motion for substitution. Similarly, it is not clear to this Court whether a successor or representative of Ramos's was aware of this case. Therefore, out of an abundance of caution, the Court directs that a copy of this order be sent to the Department of Corrections, as well as the

---

[14] As discussed previously, this Court declines to construe this filing as an amended or supplemental pleading under Rule 15. *See supra* at 2.

representative Ramos attempted to add as a plaintiff in his motion. *See* Docket 9 at 1.

## III. Conclusion

Thus, it is ORDERED:

1. That Ramos's claims against Reyes, Paul, and Haynes in their official capacities for money damages are dismissed with prejudice under 28 U.S.C. §§ 1915(e)(2)(b)(iii) and 1915A(b)(2).
2. That Ramos's requests for injunctive relief against Reyes, Paul, and Haynes, in their individual and official capacities, are dismissed as moot.
3. That Ramos's Eighth Amendment deliberate indifference claim against Paul in her individual capacity for money damages is dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).
4. That Ramos's Eighth Amendment deliberate indifference claim against Haynes in his individual capacity for money damages is dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

5. That Ramos's Eighth Amendment deliberate indifference claim against Reyes in his individual capacity for monetary damages is dismissed without prejudice for failure to state a claim upon which relief may be granted under 28 U.S.C. §§ 1915(e)(2)(B)(ii) and 1915A(b)(1).

6. That Ramos's state-law medical malpractice and medical negligence claims are dismissed without prejudice for lack of subject-matter jurisdiction.

7. That Ramos's motion to appoint counsel, Docket 6, is denied as moot.

8. That Ramos's "Motion to Substitute and Amend Pursuant to Rule § 15 & 25 of Fed R. Civ. P." is granted in part and denied in part. The motion, Docket 9, is granted to the extent that Ramos sought to correct the spelling of Defendant Aaron Haynes's name, but denied to the extent that Ramos intended to add a representative as a plaintiff under Rule 25(a).

9. That the Clerk of Court will send a courtesy copy of the complaint and supplements, Dockets 1, 2, 3, the "Motion to Substitute and Amend Pursuant to Rule § 15 & 25 of Fed R. Civ. P.[,]" Docket 9, and this order, to Jessica Cruz, at 3275 Dow Lane, Spring Hill, Florida, 34609. Additional copies of these documents shall be sent to Addyson Aguirre, South Dakota Department of Corrections General Counsel, in Pierre, South Dakota. If Ramos's institutional file identifies a next of kin, Aguirre should mail a copy of the complaint and supplements,

Dockets 1, 2, 3, the "Motion to Substitute and Amend Pursuant to Rule § 15 & 25 of Fed R. Civ. P.[,]" Docket 9, and this order, to the next of kin.

Dated August 27, 2026.

BY THE COURT:

/s/ *Camela C. Theeler*
CAMELA C. THEELER
UNITED STATES DISTRICT JUDGE